UNITED STATES of America, Appellee,

v.

James D. HANLON et al., Appellants.

Nos. 408–410, Dockets 76–1340, 76–1402, 76–1403 and 76–1340.

United States Court of Appeals, Second Circuit.

Argued Nov. 3, 1976.

Decided Jan. 18, 1977.

Peter Fleming, Jr., New York City (John E. Sprizzo, Douglas K. Mansfield, Curtis, Mallet-Prevost, Colt & Mosle, New York City, of counsel), for appellants.

Jeffrey I. Glekel, Asst. U. S. Atty., New York City (Robert B. Fiske, Jr., U. S. Atty., Marc Marmaro, Frederick T. Davis, Asst. U. S. Attys., S.D.N.Y., New York City, of counsel), for appellee.

Before MOORE, FEINBERG and MESKILL, Circuit Judges.

MESKILL, Circuit Judge:

This case grows out of a massive fraud perpetrated upon the National Bank of North America ("NBNA") by Tidal Marine ("Tidal").[1] The scheme was simplicity itself. Tidal was in the business of owning ships, a business universally carried on with borrowed money. The principal security for these borrowings is a mortgage on the ship itself and an assignment of the charters entered into between the shipowner and the shippers who actually operate the boats. By forging the purchase documents and charters for much of its fleet, and through the bribery of lending officers at NBNA, Tidal was able to borrow vast sums of money, approximately thirty million dollars, on the strength of wholly inadequate security. When the scheme finally was revealed, it resulted in the bankruptcy of Tidal, several civil actions for fraud, and this prosecution.

Appellant Hanlon was the attorney who handled most of Tidal's legal matters. Naslas was Vice President of Tidal, and its chief operational officer. Katritsis was the nephew of Harry Amanatides, the founder and President of Tidal, and served as his confidential secretary. Amanatides and three others, Ion Livas, the Chairman of Tidal, Michael Blonsky, who was the manager of Interocean Brokerage, a shell corporation controlled by Livas and Amanatides, and Gregory Spartalis, a lending officer of NBNA, were also indicted for participation in this fraud. However, they all fled the jurisdiction and have never been put to trial.[2]

In 1975, the three appellants were named in a 127-count indictment growing out of this fraud. In addition, Naslas, along with four others not now before the Court, was named in a six-count information.

After a two-week trial in the Southern District of New York, Milton Pollack, J., defendants were convicted by a jury. Hanlon was found guilty of four counts of conspiracy, 18 U.S.C. § 371; three counts of wire fraud, 18 U.S.C. § 1343; and six counts of making false statements in connection with obtaining loans from a federally-insured bank, 18 U.S.C. § 1014. Naslas was convicted of four counts of conspiracy, three counts of making false statements, and one count of aiding and abetting the receipt of a bribe by bank officers, 18 U.S.C. §§ 2, 215. Katritsis was convicted of two counts of conspiracy and five counts of making false statements. Hanlon was sentenced to concurrent terms of five years and two years on various counts. Naslas received concurrent sentences of two years, of which all but six months was suspended, followed by three years probation. Katritsis received concurrent sentences of two

---

1. To a far lesser extent, the same device was used to defraud the London branch of the Bank of America. This fraud was the subject of Counts Two through Seven and Seventeen through Twenty-two of the indictment.

2. An alleged co-conspirator, Joseph Metzger, an officer of NBNA, was convicted of four counts of willful misapplication of bank funds in a separate trial. Six others connected to the scheme, Mark Scufalos, Nico Cotzias, Stanley Farber, Francis Marone, John Shevlin, and Michael Panayotopulos, pled guilty.

years, with all but four months suspended, to be followed by three years probation.

On this appeal, all three raise various grounds of objection. For the reasons set forth below, we affirm the judgments of conviction on all counts.

## I. *Sufficiency of the Evidence.*

All three appellants concede the existence of the fraudulent scheme and their preparation of various false documents. However, all three deny knowing participation and, not surprisingly, claim that they were innocent dupes of the co-conspirators who are presently fugitives. On this appeal, each claims that there was insufficient evidence of guilty knowledge for the case to be sent to the jury. We have concluded that the evidence as to each was more than sufficient. Because of the voluminous record and the number of crimes of which the appellants were convicted, we can no more than briefly indicate the nature of the evidence against each.

### A. *Hanlon.*

■■ Hanlon concedes that there was sufficient evidence of guilty knowledge on his part as to seven counts of the indictment, involving fraudulent loans on four ships. Since he received concurrent sentences of five years on these convictions, even were we to find that there was insufficient evidence on the other counts, we would affirm his conviction. *United States v. Vasquez*, 468 F.2d 565 (2d Cir. 1975); *United States v. Gaines*, 460 F.2d 176 (2d Cir. 1972). In addition, this evidence is probative of guilty knowledge on the other counts as well. We deem it highly unlikely that the chief counsel for Tidal, who spent at least 90 percent of his professional time on that single client, would be taken into the criminal conspiracy on some of the transactions he directed and not others. The jury was, of course, entitled to draw

this inference as well. However, we do not rest our finding of sufficiency on this alone.

For example, Hanlon arranged loans on ships which were fraudulently represented as being on time charters to Port Line/Blue Funnel and Mitsui OSK Lines. Shortly after this, he incorporated Liberian shell corporations with virtually identical names.[3] At trial, Hanlon could offer no explanation for these incorporations. The prosecutor quite properly argued to the jury that they were the groundwork for an attempt to cover up the forged nature of the charters.

■ Hanlon also prepared papers in which it was represented that a ship on which a loan was obtained was purchased for $5.5 million. The ship had shortly before been purchased for $3.3 million. Hanlon must have known the true price, since he had received a finder's fee of $325,000 arising out of the purchase. There was, furthermore, completely credible testimony that Hanlon knew of Bank of America's lending limitation to 75 percent of the purchase price for ship loans. As a final example, Tidal was unable to arrange a loan on the purchase of six ships since it had exceeded its loan limit at NBNA. Mark Scufalos accordingly posed as the purchaser. Hanlon prepared the documentation showing that Scufalos was the principal; the government made a credible showing that Hanlon knew he was in fact acting for Tidal,[4] and that NBNA would not have made the loan had it known this.[5]

### B. *Naslas.*

■■■ There was direct, credible testimony that Naslas knowingly paid bribes to the loan officers at NBNA responsible for Tidal matters. Inasmuch as the evidence clearly showed the existence of a criminal conspiracy to defraud the bank, this evidence is sufficient in itself to support a finding of knowledge on the other counts as well, as

---

**3.** The names chosen were Port Line/Blue Funnel Line of London, Ltd. and Mitsui OSK Lines K.K. of Tokyo, Ltd.

**4.** There was evidence showing that Hanlon performed a similar service for Tidal in transac-

tions for which he concedes the sufficiency of the government's proof.

**5.** Other than these transactions, Hanlon makes no challenge to the sufficiency of the evidence.

Judge Pollack charged the jury.[6] Fed.R. Evid. 404(b); McCormick on Evidence § 197(1) (2d ed. 1972); 2 Wigmore on Evidence § 321 (3d ed. 1940); *United States v. Ostrowsky,* 501 F.2d 318 (7th Cir. 1974); *United States v. Hoffman,* 415 F.2d 14, 18–19 (7th Cir.), *cert. denied,* 396 U.S. 958, 90 S.Ct. 431, 24 L.Ed.2d 423 (1969). Moreover, there was direct testimony that Naslas, like Hanlon, knowingly misrepresented Scufalos as the owner of Tidal's ships in order to obtain loans. There was more than sufficient evidence to convict Naslas.

### C. *Katritsis.*

 There was evidence that Katritsis was a confidant of Amanatides and did his "personal" typing, despite his limitation to a "hunt and peck" technique. It was rea-

sonable for the jury to infer knowledge of Amanatides' criminal scheme from this. Moreover, there was testimony that Katritsis knowingly falsified the financial statements of Tidal, inflating its profits and asset value in order to obtain a loan. There was also testimony that Katritsis knowingly obtained the cash used by Naslas to pay bribes. Finally, there was direct testimony that Katritsis, when asked about the authenticity of a forged document, became extremely agitated. The evidence here, too, was more than sufficient.

### II. *The Judge's Charge.*

The crucial element in this case was guilty knowledge on the part of the defendants. The appellants contend that Judge Pollack's charge on this subject, which is set out in full in the margin,[7] impermissibly

---

6. There was direct testimony that Naslas knew the purpose of these bribes was to insure the secrecy of the false representations.

7. The government must establish beyond a reasonable doubt that the defendant whom you are considering knew the statement or report to be false or the security overvalued. Medical science as yet has devised no *instrument by which you can go back and* determine what purpose was in one's mind when he performed certain acts. Rarely is direct proof available that one had knowledge of a fact or intended to bring about a result. Now and then a person may commit himself in writing or make a statement in which he concedes that as of a certain thime [sic] he had knowledge of the fact and that he acted with specific intent to achieve a specific result. But of course, that is rare, and is the exception rather than the rule.

The intent with which an act is done is often more clearly and conclusively shown by the act itself or by a series of acts than by words or explanations of the act long after its occurrence. Frequently, the acts of individuals speak their intentions more clearly than do their words.

One may apply the old adage, "Actions speak louder than words."

Accordingly, intent, willfulness and knowledge may be established by surrounding facts and circumstances as of the time acts occurred or events took place and the reasonable inferences to be drawn therefrom. This *is referred to as circumstantial evidence and* if believed, it is as acceptable as direct evidence.

Guilty knowledge cannot be established by demonstrating inadvertence, carelessness or other innocent reasons on the part of the defendant. This applies wherever in this charge reference is made to knowledge and willfulness. However, it is not necessary that the government prove to a certainty that a defendant whom you are considering knew any given fact or facts.

The element of knowledge of a given fact under this false statement or overvalued security charge may be satisfied by proof that a defendant acted with reckless disregard of what the truth was, unless he actually believed the contrary to be true. One may not deliberately close his eyes to what otherwise would have been obvious to him.

How does one go about determining whether a defendant knew that a given fact contained on a statement to a bank was false or that the value of certain security such as a vessel was overstated? This is a matter which may be inferred from other facts. Thus, if an individual was involved in loans on the same vessel at two different banks and factual representations were made in connection with the second loan which were inconsistent with representations made in connection with the first loan and the representations made in connection with the second loan were established to have been false, you might infer that such an individual had knowledge of the false nature of the second representation or acted in reckless disregard of whether such representation was false.

You may infer, if you feel such an inference to be justified, that by not attempting to *resolve an inconsistency of this nature, at the* very least an individual had acted in reckless disregard of whether or not a given fact was false.

Similarly, you may infer from a person's involvement with a particular vessel, a par-

invited the jury to convict upon a finding of mere negligence.

 It is settled law that a finding of guilty knowledge may not be avoided by a showing that the defendant closed his eyes to what was going on about him; "see no evil" is not a maxim in which the criminal defendant should take any comfort. *United States v. Bernstein*, 533 F.2d 775, 796–98 (2d Cir. 1976); *United States v. Jewel*, 532 F.2d 697 (9th Cir. 1976) (*en banc*). *See Leary v. United States*, 395 U.S. 6, 46, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969); American Law Institute Model Penal Code § 2.02(7) (Proposed Official Draft 1962). There can be no doubt that the "conscious avoidance" standard set forth in Judge Pollack's charge was entirely proper.

Reading the challenged portion of the charge as a whole, *United States v. Gentile*, 530 F.2d 461, 469 (2d Cir. 1976), we are satisfied that the jury was not invited to convict these defendants upon a finding of negligence. Judge Pollack was careful to distinguish "inadvertence, carelessness or other innocent reasons" from his definition of recklessness. The charge on this point contained no misstatement of law.[8] *See United States v. Sarantos*, 455 F.2d 877 (2d Cir. 1972). *Cf. United States v. Bright*, 517 F.2d 584, 587–88 (2d Cir. 1975).

We are troubled, however, by the repeated use of the term "reckless." This Court has previously had occasion to criticize the use of this "technical and confusing" term. *United States v. Gentile, supra*, 530 F.2d at 470; *United States v. Bright, supra*; *see United States v. Sarantos, supra*. The distinction between recklessness and negligence is elusive enough for even the most respected legal scholars. *See* Prosser on Torts, 32, 184–86 (4th ed. 1971). It follows that to the laymen on the jury, it might prove a significant source of confusion. It is thus preferable, in cases such as this, to omit the use of the term. It adds nothing to the "conscious avoidance" lan-

---

ticular charter or the particular transaction, that he had knowledge with relation to that vessel charter or transaction.

With respect to Costas Naslas or Paul Katritsis, the government contended they had taken part or had knowledge of certain improprieties while employed at Tidal Marine. If you find this to have been the case, when Naslas or Katritsis signed documents which contained these statements of fact you may infer, if you choose, that such misstatements either were done knowingly and deliberately or that Naslas and/or Katritsis acted with reckless disregard or reckless indifference as to whether such representations were false.

In the case of any particular situation you may ask yourselves did a defendant, because of his prior experience and his knowledge, act in reckless disregard of whether or not a given set of facts were false? If you conclude that he did, you may, if you wish, infer that he had knowledge of the false nature of such facts.

We wish to emphasize that, while we have upheld the conviction here, we urge district judges not to use the term "reckless disregard" in similar cases in the future.

**8.** Indeed, it is suggested by the government that on this record the defense may have waived its objection to the charge, inasmuch as it suggested an instruction containing the same misleading term. The appellant requested the following:

In deciding the question of whether a defendant had actual knowledge of falsity, you may consider as a factor the circumstance that the defendant was aware of a high probability that the statements made were false, ficticious [sic] or fraudulent. You may also consider whether the defendant acted with reckless disregard of whether the statements made were false and with a conscious purpose of avoiding the truth. If you find that such was the case, you may infer from those circumstances that the defendant had the knowledge which the offenses charged require and you may convict him of the offenses charged in the Counts I have just enumerated unless you find from all the evidence that the defendant actually believed the statements made were true. In short, a defendant may not be convicted on the Counts charging false statements if he actually believed the statements referred to in these counts were true, no matter how recklessly he may have acted. The fact that that belief was unreasonable or even foolish, is of no consequence if you find that it was held in good faith.

However, the charge actually used did stress the term "reckless" to a significantly greater degree, and thus the objection was not waived. Nonetheless, the fact that the appellants' highly competent and respected counsel requested the use of the term "reckless" indicates that any infringement of rights was minimal.

guage which we have approved, and might tend to mislead the jury. We are satisfied that, in this case the challenged portion of the charge was not error, plain or otherwise. However, should trial courts continue to employ this disfavored language, we will not hesitate to take appropriate corrective measures. *Cf. United States v. Robinson*, 545 F.2d 301 (2d Cir. 1976).

### III. *Collateral Estoppel.*

Particularly damaging testimony was given by John Shevlin, an officer of NBNA. He testified that he was bribed by Naslas, and that both were fully aware of the nature of the transaction. Shevlin gave essentially this testimony at an earlier trial against Metzger, an alleged co-conspirator of these appellants. Metzger was acquitted by a jury on the charges of bribery. Appellants now claim that Shevlin's testimony was barred at their trial by collateral estoppel.

 While collateral estoppel is a doctrine of growing importance in criminal law, see *Ashe v. Swenson*, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970), it has no application to this case. The most expansive reading of the doctrine in this case simply indicates that the jury did not believe, beyond a reasonable doubt, that Naslas bribed Metzger. Such a finding does not in any way preclude a finding that Naslas bribed Shevlin.[9] *See United States v. Musgrave*, 483 F.2d 327, 332 (5th Cir.), *cert. denied*, 414 U.S. 1023, 94 S.Ct. 447, 38 L.Ed.2d 315 (1973).[10]

The appellants raise a host of other arguments, attacking the conduct of the prosecutor and several evidentiary rulings of Judge Pollack, along with a miscellaneous collection of alleged defects labelled "other error" in their brief. We have carefully considered them all, and find them to be

without merit. The judgments of conviction are affirmed.

---

9. In this connection, we note that corroborating evidence of bribery was presented for the first time at this trial.

10. It is possible that repeated use by the government of testimony discredited by a jury, while not raising an issue of collateral estoppel, would call for the exercise of our supervisory powers. The circumstances requiring this, however, would have to be far more aggravated than are present here, and thus we do not reach the issue.