**UNITED STATES of America, Appellee,**

v.

**Anne LAMONT, Defendant-Appellant.**

**No. 1226, Docket 77–1118.**

United States Court of Appeals,
Second Circuit.

Argued May 26, 1977.
Decided Oct. 28, 1977.

---

214

Neal J. Hurwitz, New York City (Segal & Hundley, Douglas F. Eaton, Lawrence S. Bader, New York City, on the brief), for defendant-appellant.

Steven M. Schatz, Asst. U. S. Atty., New York City (Robert B. Fiske, Jr., U. S. Atty., S. D. N. Y., John S. Siffert, Frederick T. Davis, Asst. U. S. Attys., New York City, of counsel), for the appellee.

Before FEINBERG and DANAHER, Circuit Judges,* and DOOLING, District Judge.**

DANAHER, Senior Circuit Judge:

Basically, the indictment charged that Defendant had devised schemes and artifices to defraud and intended so to defraud, certain victims hereinafter named and from them, to obtain money by means of false and fraudulent pretenses and representations. The respective counts alleged the use of the mails and wire communications in furtherance of her operations in violation of 18 U.S.C. §§ 1341, 1343 and 2314.[1]

During the course of a three-week jury trial, the Government presented its case through some twenty-three witnesses. Tes-

---

* Senior Circuit Judge of the District of Columbia Circuit, sitting by designation pursuant to 28 U.S.C. § 294(d) (1970).

** Of the Eastern District of New York, sitting by designation.

1. The criminal docket entries disclose that the jury trial began November 22, 1976, and concluded December 10, 1976, with jury verdict of guilty on counts 1, 2, 3, 4, 6, 7 and 8, a mistrial having been declared as to count 5. On Febru-ary 4, 1977, the defendant was sentenced to imprisonment for a period of three years on each of counts 1, 2, 3, 4, 6, 7 and 8 to run concurrently with each other. Additionally the defendant was ordered to pay the costs of prosecution pursuant to 28 U.S.C. § 1918 and to pay fines of $1,000 on each of the enumerated counts, such fines to total $7,000. Notice of appeal was filed February 7, 1977, with surety bond pending appeal set at $75,000.

timony developed that in the successful execution of her plans,[2] Defendant obtained from one John Barry of Toronto the sum of $60,000., and, from a West Virginia bank,[3] she further secured a total of $225,000. That she received such funds as stated has never been denied.

The Government argued that Defendant never intended to and never did repay the respective sums, so mulcted. Defendant chose not to testify.

Defense counsel through cross-examination and argument sought to inject an element of reasonable doubt and, particularly, to develop a lack of *intent* on her part in the execution of her plans. Thus, Defendant here has contended that if she "was acting in good faith at the time she obtained the money and at the time she caused the jurisdictional acts,[4] she was innocent of the crime charged."

We do not in this case have what Chief Justice Warren identified as the familiar pattern of the "confidence game."[5] Rather the jury here could have perceived this Defendant as a glib, sophisticated figure, trained in the financial world and knowledgeable in the techniques and routine of banking and investment practices, even on the international front. We need not at this point interpolate the details of the evidence underscoring such permissible conclusions. But we may turn back a century and a half and note the words of Mr. Justice Story in *Wood v. United States,* 41 U.S. (16 Peters) 342, 360–361, 10 L.Ed. 987 (1842):

> . . . fraud, being essentially a matter of motive and intention, is often deducible only from a great variety of circumstances, no one of which is absolutely decisive; but all combined together may become almost irresistible as to the true nature and character of the transaction in controversy . . . . .

> . . . it is a general principle of law, that whenever a fraudulent intention is to be established, collateral facts tending to show such intention are admissible proof.

The trial judge here alertly identified the core issue to be resolved by the jury. Taking account precisely of what he perceived to be the strategy[6] of Defendant's counsel, the judge instructed the jury:

> The defendant in this case argues through her counsel by her plea of not guilty, by her arguments in the case and by the proof in the case that she acted in good faith. It is up to you to decide whether that is the case or not. And if you decide that the defendant did act in good faith throughout all these transactions, it is your duty to acquit the defendant on all counts.

> A defendant has no burden to establish a defense of good faith, however. The burden is on the Government to prove

**2.** The individual counts here had incorporated basic elements in much the same fashion as may be noted in *Vause v. United States,* 53 F.2d 346, 348 (CA 2), *cert. denied,* 284 U.S. 661, 52 S.Ct. 37, 76 L.Ed. 560 (1931).

**3.** First National Bank of South Charleston, South Charleston, West Virginia, hereinafter West Virginia Bank.

**4.** Identified on Defendant's brief as use of the mails, telephone, telex or interstate travel, each of which "acts occurred within a very few days after the two occasions on which Miss Lamont obtained money."

**5.** *Pereira v. United States,* 347 U.S. 1, 6 (1954), *and see id.,* pages 7 and 8 re 18 U.S.C. §§ 1341 and 2314 there involved and discussed.

**6.** Defendant here called only two witnesses, both of whom had had more or less extensive dealings with Defendant. In particular defense counsel sought through their testimony to establish certain traits of character, said to be attributable to Defendant. We may recall that in *United States v. Tomaiolo,* 249 F.2d 683 (CA 2 1957), Judge Medina, dissenting, observed at 704:

> . . . Those experienced in trial strategy are well aware of the fact that seasoned and resourceful lawyers such as those defending these appellants never open up a subject without a purpose. Often the subject matter seems of little significance, but it may lay a foundation for a plausible argument on summation or, more often, it may be done merely to sow seeds here and there which it is hoped will germinate and bear fruit covertly in the minds of the jurors.

fraudulent intent and consequent lack of good faith beyond a reasonable doubt.

However misleading or deceptive a plan may be, it is not fraudulent if it was devised and executed in good faith with an honest belief in the truth of the representations made . . . .

The jury returned a guilty verdict on seven of the eight counts set up in the indictment.[7] Unless it shall hereinafter appear that there was error affecting substantial rights of this Defendant, we will be bound to affirm her conviction. We so approach our consideration of the claims urged upon us.

It is not for a reviewing court to weigh the evidence or to determine the credibility of witnesses. The verdict of the jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942). *See also United States v. Kahaner,* 317 F.2d 459, 467–468 (CA 2), *cert. denied,* 375 U.S. 836, 84 S.Ct. 74, 11 L.Ed.2d 65 (1963).

We turn now to the background.

## FACTUAL SUMMARY

### A

Compendiously to be stated, the background here may first identify a professor and author, one John Stoessinger, who formerly had been Acting Director of Political Affairs at the United Nations and Director of the Institute of the United Nations at City University of New York. During a developing love affair between Stoessinger and Defendant, the latter convinced Stoessinger that because of her prior employment with RCA, she could and would arrange for RCA to distribute to its employees and clients some 400,000 copies of Stoessinger's book "Nations in Darkness." At Defendant's direction and largely reflecting her own dictation, Stoessinger signed and turned over to Defendant various letters of recommendation.

7. See footnote 1, *supra.*

Prepared on the stationery of United Nations and City University, the letters depicted Defendant's international financing reputation. Such letters additionally "certified that Miss Anne Lamont has been a member of the Peace Research Unit of the Political Affairs Division of the United Nations. . . . ." Moreover, it was thus represented that "Miss Lamont has already performed valuable services in this connection." In truth, Defendant had not performed any valuable services for the Peace Research Unit. Some of these letters were to play a part in advancing Defendant's plans.

It developed that over the period of Defendant's dealings hereinafter discussed, Stoessinger received from Defendant some $80,000., ostensibly as advances against the proceeds to be realized from the distribution of Stoessinger's book.

### B

### IN RE VICTIM JOHN BARRY

John Barry had acquired in Toronto, Canada, interests in Studio Center Ltd., hereinafter Studio, a facility for the production of motion pictures and television programs. To bolster the lagging finances of Studio and in an effort to secure current financing in the amount of $600,000., Barry enlisted the services of one Warren Rubel, an investment banker. The latter was already acquainted with Defendant.

Rubel and Defendant met in New York to discuss the Studio project. Defendant then assured Rubel that she saw no real problem and that she could easily provide [8] the desired financing with the chief difference that she set up a target, not of $600,000. but of $2,000,000. for Studio.

Defendant early in 1973 visited Studio Center in Toronto, toured the facilities, met with the Manager of the Bank of Montreal and gave assurances that there would be no serious difficulty in arranging the loan.

8. Her "loan" from the West Virginia Bank was already overdue at that time.

Shortly after her return to New York Defendant telephoned to Barry requesting him to come to New York. There she supplied details concerning Dr. Stoessinger and his status at the United Nations. She envisioned the latter as serving on Studio's board of directors and contemplated aloud that Studio could make films based upon numerous books which had been authored by Stoessinger. She presented Barry with two of the Stoessinger letters previously mentioned, written on stationery of United Nations and of City University. She told Barry that she had contacts with European banks, had arranged loans for foreign countries, and had millions of dollars in commissions due to her.

It just so happened that Barry joined Stoessinger and Defendant for a dinner evening during which discussion included the possibilities of Stoessinger's doing educational television from the Studio.

The following day after assuring Barry that the "financing was all arranged," Defendant made it clear that for a short period she would need the sum of $50,000. to be used in Europe to clear up financial barriers and that she would require $10,000. as a loan for herself. Not to be omitted, in the background, was her agreement to accept a commission of ten per cent of the finances to be made available to Studio.

So it was that Barry flew to Toronto, there obtaining through the Bank of Montreal a $60,000. draft made payable to himself.

When Barry returned to New York and met with Defendant, she suggested that she needed the funds at once in order to wire funds to Switzerland. She inspired Barry's phone call to Toronto to ascertain how the matter could be expedited. The Bank of Montreal sent a telex to its agency in New York to permit the $60,000. Canadian bank draft to be converted to a $60,000. check in United States currency. That check Defendant caused to be made payable to Operations Multi-National, a company owned by Defendant.

Lamont thereupon told Barry that with the financing so arranged "we are going to sign the papers in Europe," but no such financing had been arranged and Defendant had not wired funds to Europe.[9]

When Barry and Defendant were about to fly to Europe, Stoessinger at the airport autographed for Barry four of his books. In due time Barry learned from Defendant herself that she had used the $50,000. portion for her own ends.

Barry lodged a complaint with the Postal Inspection Service. When interviewed by an inspector, Defendant told him that she was wiring $64,500. representing $60,000. plus interest. She sent a telex which falsely so stated. Neither Barry nor Studio received from Defendant any part of the $60,000.[10]

### C

### IN RE VICTIM WEST VIRGINIA BANK

Another scheme with Lamont as principal ultimately involved a loss in excess of $225,-000. suffered by First National Bank of South Charleston, South Charleston, West Virginia, herein West Virginia Bank.

Defendant at one time had worked on a certain project with one Snellen Johnson[11] who was Chairman of the Board of Navsat Systems, Inc., hereinafter Navsat. Johnson enlisted the aid of Defendant in obtaining financing for Navsat. Defendant told Johnson she had in mind some Swiss finan-

---

9. Rather, Defendant had given Stoessinger a check in the amount of $30,000.; repaid to her beautician a personal loan of $5,500.; she paid $6,000. to discharge an overdue phone bill of her Corporation, Operations Multi-National; and otherwise Defendant wired $5,500. to a Colorado bank, for deposit partly to her own account and partly to the account of her Corporation, and $5,000. went to cash.

10. Barry was unsuccessful in following months in efforts to reach Defendant. With an attorney Barry arranged a confrontation with Stoessinger who finally paid Barry $3,000.

11. Cross-examination of Johnson disclosed that after pleading guilty in Utah to a charge of selling unregistered securities, Johnson had been enjoined from selling securities in that state.

ciers who might be interested in financing Navsat but that they needed collateral. In due course, she induced Johnson to bring to her in Switzerland 200,000 shares of Navsat stock, represented by certificates numbers 894 and 895, each for 100,000 shares. No European financial arrangements were perfected.

Despite Johnson's repeated requests for the return of the Navsat certificates, Defendant retained possession of them, assuring Johnson that she was still working on other leads to secure the desired financing. In the course of the dealings with Johnson, it developed that West Virginia Bank might be interested in financing Navsat.

Defendant arranged a business visit with President George Martin of West Virginia Bank. She convinced Martin that she had a connection with United Nations and provided Martin with two of the letters of recommendation which she had procured from Dr. Stoessinger, *supra*. Martin required a financial statement from Defendant who then grossly had misrepresented that she had an income of $723,000. and that her net worth was in excess of $2,000,000.[12]

Martin finally granted Defendant a personal loan of some $200,000. to be repaid in 120 days at eight per cent interest, but Martin required collateral. She had not brought the Navsat certificates to West Virginia but it was arranged that she would deposit those certificates with the West Virginia Bank's correspondent, Manufacturers Hanover Bank in New York. She did so, and thereupon, as authorized by Martin, received $154,000. in checks. The loan was not repaid when due, whereupon West Virginia Bank extended the original note for an additional 30 days, and permitted Defendant to borrow the further sum of $25,-000.[13]

Complete default having occurred when Defendant failed to repay the loans, West Virginia Bank brought suit, was awarded judgment against Defendant but West Virginia Bank failed to recoup the amount of the "loans" and thus was no worse off than Snellen Johnson or Navsat or one Timothy.[14]

Defendant utilized the proceeds of the Bank's loans for her own purposes.[15] The West Virginia Bank filed a complaint with SEC which, dollar-wise, availed nothing.

## CONTENTIONS HERE CONSIDERED

### 1

Prior to trial the Government provided Jencks Act data to the defense. Also, how-

---

**12.** She had overstated her income by some $700,000. She had paid no income tax, indeed she had not even filed an income tax return between 1970 and 1976.

**13.** As additional background, it may here be noted that Snellen Johnson and one Jerry Timothy were principals in control of Navsat Systems, Inc. Johnson and Timothy had joined in back-dating Navsat stock in Timothy's name and had treated as "lost" the Navsat stock certificates, numbers 894 and 895. Johnson and Timothy thereupon caused replacement of the so-called "lost" certificates by two other certificates bearing numbers 1752 and 1753, each representing 100,000 shares of Navsat stock.

It was arranged that Defendant would purchase from Timothy the replacement shares of Navsat stock for which Lamont promised to pay Timothy two dollars per share with a down payment of $50,000. which Lamont said would come from the proceeds of the West Virginia Bank loan. She paid him nothing, then or later. Defendant did not tell Johnson and Timothy that she had already consummated the loan and had received and distributed the funds, $50,000. of which she had paid to Stoessinger.

Defendant posted the newly acquired certificates as additional collateral for West Virginia Bank's extension of the original note, then already overdue. The Bank granted an extension of 30 days and permitted Defendant to borrow the further sum of $25,000.

We have referenced only a few of the salient aspects of this West Virginia Bank business.

**14.** Timothy received nothing from the "sale" of his stock, and neither Johnson nor Navsat shared in the "financing" undertaken by Lamont. The West Virginia Bank's summary judgment against Lamont was entered on October 22, 1976, for $225,000. plus interest. That judgment remains unsatisfied.

**15.** Shortly after receipt of the proceeds of the West Virginia Bank loan, Defendant issued checks: $6,000. to her sister, $465. to Tiffany's, $25,000. to one Erwin Bornstein, $34,000. to satisfy a civil judgment, and $50,000. to cash and $50,000, to Dr. Stoessinger.

ever, the Government submitted to the trial judge pursuant to Rule 16(d)(1), F.R. Crim.P., an application for an order that certain materials need not be disclosed. Notice was given to Defendant that the Government had so moved, but that notice gave no identification or disclosure of the materials so referenced. The trial judge considered the submission, ordered that the *in camera, ex parte* application be granted "in all respects," and then directed that the contents be sealed, and marked Court Exhibit 1. Defendant both before and during the trial had sought unsuccessfully to learn the nature and the contents of Court Exhibit 1.

Defendant here has suggested that Judge Palmieri "may well" have been influenced in his imposition of the "extremely harsh sentence" and in his conduct of the trial because of undisclosed documents comprising Court Exhibit 1. We are further told that if this court does not reverse the conviction, it should remand for re-sentencing before another judge. Defense counsel points out that the presentence report which was read by defense counsel prior to sentence was a report favorable to Lamont.

It "may well be", counsel speculates, that the judge had been influenced by the *ex parte* materials which had been presented in Court Exhibit 1.

Counsel cites *United States v. Robin,* 545 F.2d 775, 780–781 (CA 2 1976), and *United States v. Rosner,* 485 F.2d 1213, 1229–1230 (CA 2 1973), both clearly distinguishable from the situation here.

In *Robin,* defense counsel was permitted in chambers to see the presentence report but was not allowed to show it to the defendant. The defendant denied the damaging facts asserted in the report and in a separate letter which the United States Attorney had sent to defense counsel and the court. The defendant sought to offer evidence to support his denials. The court refused to consider such evidence and imposed a thirty year prison sentence. The Court of Appeals vacated the sentence because the veracity of the sentencing data had been seriously questioned, and the de-

fendant has not been given adequate time to prepare, and a reasonable opportunity, to rebut the material submitted to the court.

In *Rosner,* similarly, the presentence report was supplemented by a prosecutor's memorandum detailing seventeen additional episodes of alleged misconduct not all of which, it was admitted, could be proved. The defendant asked for and was refused time to prepare to answer the charges, and the court sentenced at once on a basis that included consideration of the prosecutor's memorandum.

Here, defense counsel had read the presentence report and found it favorable to Defendant.

The trial judge here can not have failed to know that F.R.Crim.P. 32(c)(3) requires that the presentence report be made available to the defendant or his attorney; *and see Gregg v. United States,* 394 U.S. 489, 492, 89 S.Ct. 1134, 22 L.Ed.2d 442 (1969).

██ Court Exhibit 1 not only had been examined by the trial judge, but the materials therein contained had been and remained sealed pursuant to Rule 16(d)(1). The judge had noted on the sealed container "Motion granted in all respects. So ordered."

We regard his conclusion as an exercise of his discretion in evaluating the possible usefulness of the contents of the Exhibit. Whether he viewed such contents as entirely collateral to this case, or immaterial to the issue of the guilt of Defendant, we accord great deference to his ruling. It will be sustained.

Moreover, we have carefully read Court Exhibit 1 and find therein nothing whatever which might in any respect have affected the sentence imposed. Fully aware of the nuances and developments at the trial, the judge in pronouncing sentence observed that

the defendant [had] perpetuated [perpetrated?] the well-orchestrated larcenies disguised as projects in international finances. She performed her deceitful acts with careful premeditation over a protracted period of time. . . . The

defendant is a highly intelligent person and she misused her knowledge of international finance and her financial expertise to the detriment of a number of parties including a West Virginia Bank.

. . .

■ We reject Defendant's contention that the sentence imposed was "harsh." We have mentioned the exact terms n. 1, *supra,* well within the limits prescribed by the applicable statutes. Despite Defendant's speculation, hereinbefore mentioned, we find no basis for a conclusion that the sentence was excessive, indeed it is simply not reviewable. *Townsend v. Burke,* 334 U.S. 736, 741, 68 S.Ct. 1252, 92 L.Ed. 1690 (1948).

## ANOTHER CONTENTION

### 2

■ Before trial, the judge granted the Government's motion to preclude cross-examination of Barry concerning his arrest as a material witness. Defendant's counsel now argues that he erroneously had been denied an opportunity to establish that Barry had been coerced into testifying for the Government.

It turned out that Barry had decided to return to Toronto just as final preparations for trial were being worked out. Without notice to the prosecution and refusing to answer phone calls, Barry had left his hotel and headed for the airport. There placed under arrest, he shortly appeared with his own attorney before Judge Griesa. Upon learning the facts at a bail hearing, Judge Griesa perceived that Barry, ill and impatient, had been the victim of a "misunderstanding." He further concluded that the Government had acted prudently in attempting to make certain that Barry would be available.

Barry's attorney represented that Barry's frame of mind was one of determination somehow to recover from Defendant, the thousands of dollars of which he had been mulcted. His counsel told the prosecutor that Barry would return, that the Assistant United States Attorney was destroying himself and making a hostile witness out of a co-operative witness. Certainly, Defendant had had nothing to do with Barry's arrest at the airport.

Concurring in Judge Griesa's conclusion that there had been an unfortunate misunderstanding, Judge Palmieri ruled that Barry indeed was a voluntary witness and further exploration of details was collateral to the issue before the court. In any event, defense counsel did cross-examine Barry about his several visits to the United States Attorney's office and the resultant improvement in his memory. Under the circumstances, the limitation on cross-examination was not reversible error.

## A THIRD CONTENTION

### 3

■ This court time and again has been confronted with claims that a trial judge has so far injected himself into the proceedings as to have caused prejudice to the defense. Almost as often, it has been held essential that a judge to achieve a fair trial is duty bound to refrain from active participation on one side or the other. *See e. g., United States v. Reed,* 526 F.2d 740, 743 (CA 2 1975), *cert. denied,* 424 U.S. 956, 96 S.Ct. 1431, 47 L.Ed.2d 361 (1976), and *United States v. Curcio,* 279 F.2d 681, 682 (CA 2), *cert. denied,* 364 U.S. 824, 81 S.Ct. 59, 5 L.Ed.2d 52 (1960).

■ Moreover, a trial judge assuredly is authorized to ask questions which may assist a jury in the evaluation of the nature of the transactions under consideration. *United States v. Natale,* 526 F.2d 1160, 1170 (CA 2 1975), *cert. denied,* 425 U.S. 950, 96 S.Ct. 1724, 48 L.Ed.2d 193 (1976).

■ Defendant has contended before us that the trial judge repeatedly had urged the jury to sympathize with the Government witness Stoessinger. Such a postulate purportedly is based upon certain questions put by the judge after respective counsel had ceased their questioning of Stoessinger.

It had been brought out that Stoessinger had entered a plea of guilty to an information charging misprision of felony in violation of 18 U.S.C. § 4, "in failing to report fraud by defendant," as her counsel puts it on brief.[16]

Defendant argues that questioning by the trial judge had led "the jury away from the defense inference, namely that Miss Lamont was a victim of Stoessinger."[17]

Later, during the court's charge Defendant submits, the judge had used language which "unabashedly appealed to the jury's emotions." Defendant's brief tells us that the judge had failed to present Defendant's contention "that Stoessinger victimized her to the tune of $80,000." There was no testimony whatever to any such effect. Describing the judge's charge as given "with florid eloquence" and as supplying "maudlin detail," Defendant on brief further tells us that the trial judge had never, concerning the misprision of felony information, *supra,*

> instructed the jury about the one *proper* use of the information, namely as evidence that Stoessinger's credibility might be unreliable. In short, all of the Court's actions tended improperly to bolster Stoessinger's credibility and to obscure the very real possibility that Stoessinger was lying.

Stoessinger's testimony, completely self-serving, showed this holder of a Phi Beta Kappa key to have been graduated from Harvard University, to have been a high-ranking member of the United Nations staff who wept in the presence of the jury when confronted by a realization of the plight in which he had placed himself and in which he was found out.

The jury must simply have refused to believe his story that Defendant was providing him with "loans" or with "advances" against future sales of some 400,000 books which she would cause to be sold under the good auspices of RCA. None had been sold. The jury could not have failed to note that when Barry came to New York, Stoessinger's participation in a dinner evening with Lamont provided a great opportunity during which his capacity was extolled and possibilities for his co-operation with the Barry venture were explored. He was on hand the next day at the airport when Lamont and Barry were to board the plane for Europe. Then he even autographed four books for victim Barry.

The Barry fraud yielded $60,000. of which this same Stoessinger received the first $30,000. He later was forced by Barry to disgorge the paltry sum of $3,000. That was all Barry ever recovered. Stoessinger next got his hands on some real money when Lamont gave him $50,000. from the West Virginia Bank fraud.

It reasonably might be inferred that the jury would not have returned a guilty verdict had it not been that the Stoessinger letters and the Stoessinger participation in events had made possible the execution of the nefarious schemes concocted by the collaboration of Stoessinger with Defendant. We find no error in the trial judge's treatment of the Stoessinger aspect.

**16.** 18 U.S.C. § 1 provides that any offense punishable by imprisonment in excess of one year is a felony but any other offense is a misdemeanor. The offenses of which Defendant was convicted, 18 U.S.C. §§ 1341, 1343 and 2314, are felonies.

18 U.S.C. § 4 defines Misprision of felony: Whoever, having knowledge of the actual commission of a felony cognizable by a court of the United States, conceals and does not as soon as possible make known the same to some judge or other person in civil . . . authority under the United States, shall be fined not more than $500. or imprisoned not more than three years, or both.

**17.** For example, the trial judge asked Stoessinger about his "present feelings" toward Defendant. Stoessinger replied:

I am frankly puzzled. . . . On the one hand, my heart tells me, your Honor, that she loved me and that she loaned me those funds because she really wanted to make good on that book project. My *mind* tells me, however, that perhaps she tried to leverage my connection at the United Nations *in order to make profits for herself.* (Emphasis supplied).

[The jury mentally, and accurately, might have added—"and for himself."]

## VARIOUS OTHER CONTENTIONS

### 4

Defense counsel has submitted on brief the imputation that the trial judge repeatedly but erroneously had ruled against the defense. We have carefully weighed such claims, *in toto* and specifically, and we reject the defense arguments with respect thereto. This trial judge long since was well aware of his function.

"The purpose of a trial is as much the acquittal of an innocent person as it is the conviction of a guilty one. The average accused usually does not have the manpower or resources available to the [Government] in its investigation of the crime."

So wrote Judge Palmieri in *Application of Kapatos,* 208 F.Supp. 883, 888 (S.D.N.Y. 1962), cited with such clear approval by Circuit Judge Marshall (now Associate Justice Marshall) in *United States v. Wilkins,* 326 F.2d 135, 140 (CA 2 1964).

The trial judge knew very well as the case proceeded that defense counsel had sought to discredit through cross-examination the witnesses called by the prosecution. Counsel's effort to inject a reasonable doubt as to Defendant's guilt was indeed handicapped, for counsel had no witnesses of his own respecting the substantive facts. Apparently, at least until the final day of trial, he did not know, and perhaps he could not have known whether or not his client would testify.[18] For example, as to certain matter, we are told on brief that

Defense counsel had intended to authenticate these documents through the testimony of the defendant, but at the last minute she decided not to take the stand.

The trial judge had afforded almost unlimited scope to Defendant's cross-examination of the Government witnesses, a far cry from siding with the Government. The judge certainly knows full well that a trial involves a quest for truth, but he also could know that this court has said

A trial should not be a contest of wits between the court and defense counsel searching for reversible error. *United States v. Reed,* 526 F.2d 740, 742 (CA 2 1975), *cert. denied,* 424 U.S. 956, 96 S.Ct. 1431, 47 L.Ed.2d 361 (1976).[19]

■ Consider, for example, that with Timothy on the stand, defense counsel went into the background of the issuance and use of Navsat certificates, 1752 and 1753. These so-called "replacement" shares had been "bought" from Timothy by Lamont.[20] Although she had never paid for them, Defendant deposited those certificates as collateral when her original overdue note had

---

**18.** As the trial neared its termination, the district judge sought to ascertain the position of defense counsel respecting the allocation of remaining time. The transcript discloses the following:

The Court: How long do you think it would take her to testify if you do put her on the stand?

[Defense Counsel]: With what I have got I figured it would run the better part of a day. What I was going to do, your Honor, is this, and I will tell you what my whole strategy was. I was going to flesh it all out as much as I could and then cut it down to the bare bones and let them stand on the land mines and also drop her early enough in the day so they either have to be ready to the hilt or get blown to bits by not being prepared. That is what I was going to do. I was going to put her in, drop her and leave.

[A patient judge, perhaps with tongue in cheek, responded as follows]:

The Court: That is wise strategy, I must say. You want to adjourn early?

[Defense Counsel]: If we can.

The Court: I hoped we could cover at least the charges. Have you got your proposed charges here?

[Defense Counsel]: I called the office. They are typed up. I have not read them. If your clerk is going to be here—

The Court: Bring them in early tomorrow morning. Late in the evening woudln't (sic) do anybody any good. I have to read them and prepare my charge.

If you decide, by the way, not to put her on, you are going to sum up tomorrow. Do you understand that?

[Defense Counsel]: I understand that.

**19.** See also *Levin v. Katzenbach,* 124 U.S.App. D.C. 158, 363 F.2d 287, 291 (1966):

A criminal trial is not a game of wits between opposing counsel, the cleverer party, or the one with the greater resources to be the "winner."

**20.** See details, note 13 *supra.*

been extended and when she secured the additional loan of $25,000.[21]

Timothy had owned some 306,500 Navsat shares. It developed that "certificates 1753 and 1752" represented 200,000 Navsat shares. Timothy had sold to others, apparently, yet other shares which he still owned. The Government as part of the Jencks material had turned over to defense counsel a document which Snellen Johnson had sent to the prosecutor. Included therewith was a listing of Timothy's stock which had been compiled by an IRS agent.[22] Defense counsel commenced to read from that IRS listing when the judge interrupted to point out that counsel's explanations were not evidence. This material, said the judge:

> was offered to you as a cross-examination tool. This is not prepared by the witness. It was prepared by an Internal Revenue agent after the event and furnished to the Government by Johnson in 1976.

The judge ruled that he was not going to permit counsel to take more time "to clutter this record up with matters which are irrelevant, improper and incompetent."

The judge pointed out that defense counsel could have cross-examined Snellen Johnson but he had not done so. He had not called the Internal Revenue agent. Counsel explained that he sought to refresh Timothy's recollection, then asked "how can an IRS agent have compiled it without talking to the taxpayer?" He thus elicited a reply from the judge

> by auditing his business records.

\*      \*      \*      \*      \*      \*

That is how he could do it. You know as well as I do.

The judge repeated that the IRS listing was not competent, it was not Timothy's document, it was not Timothy's memorandum, "it is the preparation of a third party for whom he is not responsible."

Pertinently, and not by any means attempting to recite the almost endless colloquy between court and counsel, we quote:

> so for you to attempt to use an IRS report to a third party [Johnson] whom you could have cross-examined but chose not to in an effort to get [Timothy] to contradict himself is entirely improper and I won't permit it and again, I have an impression that you are using it as a delaying tactic.

As defense counsel rejected the notion that he had sought to create "delay", he concluded:

> I will desist, your Honor, because I don't want to provoke the Court and I don't want myself, either of us, to have to say something unfortunate. I will just desist.

In the circumstances shown, we might thus choose to say no more about the subject than that we perceive here no trial error.

■    From the very nature of yet other items of Defendant's claims, it is clear enough that she would have us retry the case on the cold printed record. For example, it is argued that the trial judge had marshaled the evidence unfairly in that the Government's case was over-emphasized and the defense witnesses had been disposed of in eight lines.[23] Yet the trial had

---

**21.** Thus, West Virginia Bank had received from Defendant Navsat certificates 894, 895 and "replacement" certificates 1752 and 1753.

**22.** The judge noted:

This paper purports to be a report by Snellen Johnson to the United States Attorney in which Snellen Johnson under date of September 27, 1976, almost on the eve of this trial, is reporting what he says is a complete listing of Timothy's stock recently done by an IRS agent. [The IRS had by then been conducting an audit of Timothy].

**23.** Judge Friendly articulated this court's view of such a claim in *United States v. Kahaner,*

317 F.2d 459, 476 (CA 2 1963), where it had been asserted that the trial judge unfairly had spent more time in summarizing the Government's evidence than had been accorded to that offered by the defense. *Kahaner (Keogh) v. United States, cert. denied,* 375 U.S. 836, 84 S.Ct. 74, 11 L.Ed.2d 65 (1963).

Again, Defendant has argued that the trial judge had erroneously dealt with the dates applicable to the specific jurisdictional acts. This court has ruled it to be sufficient if the scheme to defraud was shown to have fallen within the period charged in the indictment. *United States v. Houlihan,* 332 F.2d 8, 14 (CA 2), *cert. denied,* 379 U.S. 828, 85 S.Ct. 56, 13 L.Ed.2d 37

persisted for some three weeks during which the Government had presented 23 witnesses. The defense had called only two to testify, and neither had proffered evidence respecting substantive facts.

■ Defendant has submitted that the rulings by the trial judge had unfairly discriminated between Government charts which were admitted into evidence and a defense-prepared chart which was not. The judge pointed out that the Government charts, received in evidence, had been based upon exhibits already in evidence or upon testimony of witnesses whom the defense had been able to cross-examine. In particular, a proffered defense chart reflecting the testimony of defense witness Michel Aubert contained material stemming from hypothetical responses which defense counsel had elicited from the witness. Yet other portions derived from conversations Aubert had had with certain financiers who were not present at the trial and had not been subject to cross-examination. The judge in a proper exercise of his discretion concluded [24] that the material so projected was objectionably controversial.

With reference both to the Government's charts and to the proffered Aubert chart the judge said:

> I have no objection to you using this as an aid to your argument if and when you sum up to the jury, and I will allow the Government to do the same, but to allow

this as an exhibit I think would be misleading because it can be interpreted in ways different from the manner in which the witness has testified.

> [Defense Counsel]: Your Honor, we differ on the last description, but if the Court will allow me to use it in making a presentation to the jury, that would be acceptable.

And counsel did so.

We need not develop the background for other rulings of which Defendant has here complained. Suffice it to say that in no instance can we find that substantial rights of Defendant had been violated. It would unduly prolong our discussion—perhaps already too protracted—were we now to submit additional treatment. We turn next to hitherto untreated and unrelated aspects of Defendant's claims.

## MOTION FOR MISTRIAL

Defendant called as the first of her two witnesses one Peter Keck with whom she had had dealings "on a business and social basis" since 1970.[25] Questioned by defense counsel, Keck testified that he had discussed with others Defendant's "reputation for truthfulness, honesty, veracity." (sic).

Defense counsel then asked:

> Q. And can you tell us what that reputation is as you know it?

> The Court: Hold your answer.

(1964); *United States v. Postma*, 242 F.2d 488, 496–497 (CA 2), *cert. denied*, 354 U.S. 922, 77 S.Ct. 1381, 1 L.Ed.2d 1436 (1957); *cf. Pereira v. United States*, 347 U.S. 1, 10, 74 S.Ct. 358, 98 L.Ed. 435 (1954), where the Court saw the evidence to be clear and convincing that an accused had participated in fraud "from beginning to end."

Incidentally, just as here, *Houlihan* involved mail fraud, 18 U.S.C. § 1341; wire fraud, 18 U.S.C. § 1343; and interstate transportation of securities, 18 U.S.C. § 2314. *See* discussion, 332 F.2d at 13, citing *Pereira v. United States*, note 5 *supra*, 8–10, 74 S.Ct. 358.

**24.** Defendant has condemned the judge's ruling and his appraisal of and comment upon the evidence.

We deem invalid Defendant's complaint on this score. It is thoroughly established that a trial judge in aid of the jury may evaluate, and

is free to comment upon, evidence presented in a trial such as this.

*See United States v. Lombardi*, 550 F.2d 827, 829 (CA 2 1977), with *cf.* citations to *United States v. Natale*, 526 F.2d 1160, and *see, e. g.*, 1169–1170 (CA 2 1975), *cert. denied*, 425 U.S. 950, 96 S.Ct. 1724, 48 L.Ed.2d 193 (1976), and *United States v. Tourine*, 428 F.2d 865, and *see, e. g.*, 869–870 (CA 2 1970), *cert. denied, sub nom. Burtman v. United States*, 400 U.S. 1020, 91 S.Ct. 581, 27 L.Ed.2d 631 (1971).

**25.** Just as Johnson had consulted Defendant in seeking finances for Navsat, *supra*, and as Rubel had sought her assistance in financing the Barry Studio project, *supra*, Keck had come to Defendant. He wanted her to aid his effort to provide funds that he might exercise an option to buy Piazza Properties Ltd., a California construction and real estate company.

The judge then addressed defense counsel:

> I am sure you are asking the question in good faith but you realize up to this point in the case the veracity of the defendant has not been put in issue.[26]

> If you represent that she will take the stand and credibility will become an issue, then I will allow the question, otherwise I will not.[27]

Defense counsel thereupon asked for a bench conference. The jury was excused.

Defense counsel at once moved for a "mistrial based upon the comment that was made about Miss Lamont taking the stand."

Extensive colloquy then was inaugurated as defense counsel asserted the right of the defense to present evidence of Defendant's "reputation for truthfulness and veracity." Government counsel tendered the view that if Defendant went forward with any such evidence, the door would be opened to the prosecution to go into specific instances of conduct in refutation of the defense contention.

Defense counsel called for a ruling on his motion for mistrial which the judge at once denied even as he agreed to give a cautionary instruction.

Declining to be moved either by defense counsel or the prosecutor, the judge ruled he would not allow "proof of reputation" as matters then stood.[28]

> [Defense Counsel]: I will withdraw it if the Court has ruled that way.

> The Court: Withdraw what?

> [Defense Counsel]: The reputation as the Court has ruled.

The jury having been recalled, the judge deemed it appropriate, he explained, to give a cautionary instruction. Noting first that a defendant is presumed innocent throughout the trial until such time, if ever, as guilt shall have been established beyond a reasonable doubt, the judge turned to explaining that the burden of proving guilt beyond a reasonable doubt is on the Government.

> The defendant has no burden whatever. The defendant under our law can remain silent, the defendant under our law need call no witnesses, need submit no proof, and the Government's burden remains

**26.** There had been no refutation by the defense of any of the substantive evidence adduced by the Government in the course of its case in chief. Defense counsel through cross-examination had sought to undermine the testimony of the many Government witnesses and to impeach them or to weaken or destroy whatever weight the jury might otherwise ascribe to their testimony. No doubt the jury might have deemed some or all of those witnesses vulnerable to greater or less extent, as this court has long since remarked:

> The government must take its witnesses where it can find them. Few are the fraud cases where the government can prove its charges without calling witnesses like Hellerman who have participated actively in the scheme and profited from the fraud. *United States v. Koss*, 506 F.2d 1103, 1112 (CA 2 1974), *cert. denied*, 421 U.S. 911, 95 S.Ct. 1565, 43 L.Ed.2d 776 (1975).

**27.** It is entirely possible that the judge had in mind the situation in *United States v. Minieri*, 303 F.2d 550 (CA 2), *cert. denied*, 371 U.S. 847, 83 S.Ct. 79, 9 L.Ed.2d 81 (1962), where the defendant Minieri took the stand. Thus, *id.*, at 555 this court observed that evidence of good reputation may be offered to show that it is improbable that the defendants had committed the crime charged.

That Minieri took the stand is not controlling.

A defendant through evidence of his reputation may seek to cast doubt on the probability of guilt—whether or not he takes the stand. *See Michelson v. United States*, 335 U.S. 469, 476–477, 69 S.Ct. 213, 93 L.Ed. 168, affirming 165 F.2d 732 (CA 2 1948); *Edgington v. United States*, 164 U.S. 361, 363, 17 S.Ct. 72, 41 L.Ed. 467 (1896); *Shimon v. United States*, 122 U.S. App.D.C. 152, 352 F.2d 449, 452–453 (1965), where Judge Burger, now Chief Justice, considered the problem. *See also United States v. Fox*, 154 U.S.App.D.C. 1, 473 F.2d 131, 135 (1972); and *United States v. Cramer*, 447 F.2d 210, 219 (CA 2 1971).

**28.** Specifically, the judge stated, "unless I am cited to authority I won't allow it." Defense counsel, neither then nor thereafter, called "authority" to the attention of the judge. Instead, text *supra*, Defendant's question as to "reputation" was withdrawn.

We may only speculate as to the possible effect of the prosecutor's proposed cross-examination or whether it had become increasingly clear during the colloquy that the judge merely meant that her "veracity" had not been challenged. In either event, we need take no further notice of this aspect.

the same. I would have told you that at the end of the case and I want to tell you now to clear the atmosphere.

The judge instructed further:

Remember, the defendant is under no burden to prove anything, the defendant is presumed innocent, and it is the Government's burden to prove, if it can, the guilt of the defendant beyond a reasonable doubt.

Just keep these basic principles in mind and I will explain all this in greater detail when I charge you at the end of the proof.

■ To revert to the defense motion for a mistrial, we find no suggestion either directly or implicitly, that the judge had been commenting adversely upon the fact that Defendant had not testified. Rather, he was stating a simple fact just as obvious to the jury as it was to the judge and to counsel. It is thoroughly understood that both under the Fifth Amendment, *Griffin v. California*, 380 U.S. 609, 612, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), and under 18 U.S.C. § 3481, *Bruno v. United States*, 308 U.S. 287, 294, 60 S.Ct. 198, 84 L.Ed. 257 (1939), no presumption shall run against a defendant who has not sought to testify.

What the judge said can not be seen as having been "manifestly intended or . . . of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." *United States v. Araujo*, 539 F.2d 287, 291 (CA 2 1976); *Knowles v. United States*, 224 F.2d 168, 170 (CA 10 1955), citing *Morrison v. United States*, 6 F.2d 809, 811 (CA 8 1925), defining the "test."

The judge had promptly and correctly, *supra*, given to the jury a cautionary instruction. He had embodied the substance of the instruction which the Supreme Court had approved in *Bruno v. United States*, *supra*.

We are completely satisfied that there was no error whatever in the trial judge's denial of the motion for mistrial.

## CONCLUSION

■ Perhaps the strangest cavil submitted to us is Defendant's claim on brief that "the court did not comply with the procedure mandated by Rule 30, F.R.Crim. P." As the trial neared its termination, the actual timing depended upon whether Defendant would testify, as we have already pointed out, footnote 18, *supra*. Defense counsel sought an early adjournment. The following occurred:

The Court: I hoped we could cover at least the charges. Have you got your proposed charges here?

[Defense Counsel]: I called the office. They are typed up. I have not read them. . . .

The Court: Bring them in early tomorrow morning . . . I have to read them and prepare my charge.

The Government had submitted its requests a week earlier.

The judge warned that if Defendant were not to testify, "you are going to sum up tomorrow."

Under the circumstances, with the trial so shortly to be concluded, the judge authorized defense counsel to provide

hand notations on your submission of the Government's charges which you object to and the reason why . . . and the Government can do the same as to your submission, and I will consider the objections tomorrow morning. . . .

The proper time would have been before your summations . . . . . I will certainly consider your objections to each other's submissions.

We need say no more than that just about everything with which we are concerned on this point has been treated adequately in *United States v. Tourine*, 428 F.2d 865, 868–870 (CA 2 1970), *cert. denied, sub nom. Burtman v. United States*, 400 U.S. 1020, 91 S.Ct. 581, 27 L.Ed.2d 631 (1971).

We perceive no error in the procedure adopted and so applied.

Following the instructions, the judge canvassed with defense counsel variously as-

serted claims of error. For example, it was argued that the judge had erred in stating—as counsel put it—

> that if there was no intent *ab initio* in obtaining . . . these moneys and then at a later time there was a change of mind, then and in that event they could infer bad faith in getting it.

■ During the colloquy which followed, the judge pointed out just what had been said, and he read to defense counsel the exact language employed in the criticized instruction:

> Nor is it a defense that if the defendant first made a representation in good faith, if later at any time charged within the period covered by the indictment she realized the representations were false and yet deliberately continued to make them.

Defense counsel said he disagreed with that statement to which the judge replied: "I think this is perfectly good law."

So do we.

Defendant also claimed that the court erred in permitting the jury to hear

> what was done with the money as an indication that that might have a bearing on what her intent was.

[Counsel] continued:

> Well, that had a bearing on whether or not the money was used for her own purposes, perhaps. It may have had—

Interrupting, the judge then pointed out that *counsel* in his summary "yesterday" had said:

> . . . it is nobody's business what she did with this money as long as her intent at the time she talked to these people was to finance their loan. She was in the area of speculative financing and she was going to do her best for them and she meant it, but 10 days later, when she gets some advance cash, she spends it on her own purposes, and *you* say that all that means is she spent it for her own purposes. (Emphasis supplied).

> What kind of guidance would I be giving the jury if I tell them that?

\*   \*   \*   \*   \*   \*

The Court: Let's assume they find that she spent it for her delinquent phone calls, on a hairdresser and a few other things. What would you have told the jury the significance of that testimony was?

[Defense Counsel]: That may be circumstantial proof what her intent was but the fact—

The Court: Now we are getting somewhere.

On another matter, defense counsel contended that the judge emphasized Stoessigner as a "key witness," only to be met with the judge's reply that Stoessinger was an "important witness and I have a right to tell them that."

The judge interpreted counsel's complaint to be that the "charge was one-sided and that it tended to prejudice the defendant." The judge replied "I won't change a word of it."

We have said enough to illustrate the nature of defense counsel's expostulation.

■ Now on brief counsel directs our attention to *United States v. Hanlon*, 548 F.2d 1096, 1100 (CA 2 1977), which this court decided six weeks *after* the jury had returned its verdict in this case. We are told that the court in the instant case had used the word "recklessly" once and the word "reckless" three times.

Defendant argues thus that by the use of such terms

> . . . the essential element of criminal intent was so watered down that the jury was permitted to convict, not for deliberate and knowing misrepresentations, but for "reckless disregard" and for having "recklessly blinded herself."

Defendant would have us give retroactive application of *Hanlon* which, simply stated, is of no help to Defendant here. For one thing, the issue involved "recklessness" as distinguished from "inadvertence, carelessness or other innocent reasons." More importantly, *Hanlon*, 548 F.2d at 1101 pointed

to what had been said in *United States v. Sarantos*, 455 F.2d 877, 882 (CA 2 1972).[29] There we read:

> The phrases "reckless disregard of whether the statements made were true" and "conscious purpose to avoid learning the truth" mean essentially the same thing. (Citation omitted). Therefore, any differences in meaning that might possibly result from the substitution of "or" for "and" would surely constitute harmless error.

Defendant quite ignores what *Sarantos* said. Defendant likewise fails to give effect to what Judge Palmieri so clearly informed the jury. To illustrate:

> A statement, representation, claim or document is false if it is untrue in the main and was then known to be untrue by the person making it or causing it to be made or if that person deliberately or recklessly blinded herself to the knowledge that it was false.

Again, the jury was told:

> However misleading or deceptive a plan may be, it is not fraudulent if it was devised and executed in good faith with an honest belief in the truth of the representations made . . .

Thus the position of Defendant was contrasted with the claim of the Government, and the judge instructed:

> It is not a defense, I repeat for the defendant first to make a representation in good faith if later at any time charged within the period covered by the indictment she realized the representations were false and yet deliberately continued to make them.

The issue was illuminated additionally thus:

> The Government can also meet its burden that a defendant had actual knowledge of falsity if it establishes beyond a reasonable doubt that she acted with a deliberately reckless disregard of whether the statements were true or false *and* with a conscious purpose to avoid learning the truth. (Emphasis added).

Finally, to note specifically with reference to *Sarantos, supra*, 455 F.2d at 882, the trial judge charged:

> If you find that Lamont acted with reckless disregard of whether those statements and documents were true or false *and* with a conscious purpose to avoid learning the truth, you can draw the inference, if you so choose, that she acted out of guilty knowledge and fraudulent intent. (Emphasis added).

And granting that *Sarantos, supra*, urged the use of "and" rather than "or" in future charges on this issue, the trial judge here did so, precisely. He used the word "and," as above.

We find no merit in appellant's various contentions which do not prevail here. We have been bound to review the instructions in the context of the whole trial record, and we find no error.[30]

We have taken account of the evidence, the arguments of the parties, the balancing of the instructions and whatever other claims have been urged upon us. Over and over the trial judge had instructed the jury that as finders of the fact they were bound to exercise their own judgment in their evaluation of the testimony. *Compare United States v. DeLamotte*, 434 F.2d 289,

---

**29.** The court there discussed the applicable semantics in *United States v. Egenberg*, 441 F.2d 441, 444 (CA 2), *cert. denied*, 404 U.S. 994, 92 S.Ct. 530, 30 L.Ed.2d 546 (1971), and noted that the defendant there had acted with "reckless disregard" of whether the statement was true "or" that defendant had acted with a conscious purpose to avoid learning the truth. In *United States v. Abrams*, 427 F.2d 86, 91 (CA 2), *cert. denied*, 400 U.S. 832, 91 S.Ct. 64, 27 L.Ed.2d 63 (1970), the defendant had acted with reckless disregard of whether the statements made were

true "and" with a conscious purpose to avoid learning the truth. *Compare United States v. Gentile*, 530 F.2d 461, 471 (CA 2), *cert. denied*, 426 U.S. 936, 96 S.Ct. 2651, 49 L.Ed.2d 388 (1976), which approved the use of "deliberate disregard" rather than "reckless disregard" in the particular here under consideration.

**30.** *United States v. De Angelis*, 490 F.2d 1004, 1009 (CA 2), *cert. denied*, 416 U.S. 956, 94 S.Ct. 1970, 40 L.Ed.2d 306 (1974).

292 (CA 2 1970), *cert. denied*, 401 U.S. 921, 91 S.Ct. 910, 27 L.Ed.2d 825 (1971).[31]

The judgment of the District Court is affirmed.

---

31.   In the course of Defendant's cross-examination of Government witnesses, there were various rulings involving matter which the trial judge deemed immaterial or collateral to the principal issue. Again, for example, Defendant sought to have the court receive a copy of a New York hotel bill to support an inference that she was in New York on June 24, 1972, and thus to contradict testimony of Johnson and Timothy that they met with Defendant on that date in Salt Lake City.

   As to such an instance and to yet others of comparable import, we have found no prejudicial error affecting substantial rights.