**UNITED STATES of America,**
**Appellee,**

v.

**Robert SARANTOS and Constantine Makris, Defendants-Appellants.**

**Nos. 275, 276, Dockets 71–1816, 71–1817.**

United States Court of Appeals, Second Circuit.

Argued Nov. 12, 1971.

Decided Feb. 3, 1972.

878

Henry J. Boitel, New York City, for appellant Sarantos.

H. Elliot Wales, New York City, for appellant Makris.

James T. B. Tripp, Asst. U. S. Atty. (Whitney North Seymour, Jr., U. S. Atty., S. D. N. Y., W. Cullen MacDonald and John W. Nields, Jr., Asst. U. S. Attys., on the brief), for appellee.

Before FRIENDLY, Chief Judge, FEINBERG, Circuit Judge, and DAVIS, Judge.*

FEINBERG, Circuit Judge:

Defendants Robert Sarantos and Constantine Makris appeal from judgments of conviction after a 15-day trial before Judge Inzer B. Wyatt and a jury in the United States District Court for the Southern District of New York. Sarantos was convicted on five counts of conspiring to make false statements to the Immigration and Naturalization Service (INS) and to defraud the United States Government in violation of 18 U.S.C. §§ 371, 1001, 1546. Makris was found guilty along with Sarantos on two of those counts. Sarantos was also convicted separately on seven counts of aiding and abetting others to make false statements to the INS in violation of 18 U.S. C. §§ 1001 and 2.[1] Each defendant received a short prison sentence and a period of probation.[2] On this appeal, Sarantos and Makris challenge various portions of the trial court's charge to the jury. We find no error and affirm their convictions.

I

Viewed in the light most favorable to the Government, the record reveals the following facts: Sarantos and Makris were participants in illegal plans to obtain permanent residence in this country for male Greek aliens. Defendants sought to take advantage of an immigration rule that permitted the alien spouse of a United States citizen to obtain an immigrant visa, which entitled the alien to enter the country as a permanent resident regardless of whether the yearly quota of immigrant visas allotted to the alien's country had been exhausted. To exploit this special exception to the quota system the participants employed a scheme generally involving two steps: First, a sham marriage was arranged between the Greek alien and a Puerto Rican women who was a United States citizen; and second, a visa petition[3] was prepared over the wife's signature, stating falsely that the married couple was living together as man and wife.

Makris was essentially a marriage broker. He helped to locate Puerto Rican women who were interested in marrying Greek aliens in return for a fee. He also assisted in arranging sham marriages. Sarantos, an attorney, was involved in the second stage. The parties to the sham marriages visited his office shortly after the wedding ceremony. There the wife would sign a visa petition in blank, which Sarantos would later complete and file with the INS. In each case the petition stated falsely that the parties were living together as husband and wife. Sarantos also instructed

---

* Of the United States Court of Claims, sitting by designation.

1. The indictment contained 14 counts. Sarantos was charged in six counts of conspiracy; Makris was included in four of those counts. The remaining eight counts charged Sarantos with aiding and abetting the making of false statements. Before the case went to the jury Judge Wyatt withdrew count 11, a substantive count against Sarantos, and count 12, a conspiracy count, insofar as it applied to Makris. The jury found both defendants guilty of all remaining charges except count 1, a conspiracy count, on which both were acquitted.

2. The trial court sentenced Sarantos to nine months imprisonment on nine counts, to be served concurrently; on the remaining three counts, the court suspended sentence but placed Sarantos on probation for two years commencing after service of the prison sentence. The trial court sentenced Makris to two months imprisonment on one count, suspended sentence on the other, imposed a $500 fine on both counts, and placed him on probation for two years commencing after service of the prison sentence.

3. Before the alien spouse of a United States citizen can qualify for an immigrant visa, the latter must execute under oath a "Petition to Classify Status of Alien Relative for Issuance of Immigrant Visa" (Form I–130). In this form the citizen is required to indicate, inter alia, where the parties will reside. The INS relies on this and other information in determining whether to grant the immigrant visa.

wives who were called before the INS to say that they were living with their husbands but not to mention that they were paid to marry. Although the Government failed to show that Sarantos was ever explicitly told that the couples were not living together, it did furnish abundant evidence that Sarantos was informed of the sham nature of the marriages: In some cases newlyweds required in his presence the aid of an interpreter or sign language because they shared no common language; divorce papers were executed simultaneously with immigration papers; Sarantos was told the wife was being paid a fee; and Sarantos was at least indirectly informed that the parties were not living together. The prosecution also established that several of the couples purported to be living in buildings owned or managed by other clients of Sarantos, which might be considered "safe" addresses; i. e., the managers would be expected to tell an INS investigator that the couples were actually living together. On this evidence, the jury found Sarantos guilty not only of conspiracy but also of aiding and abetting the making of false statements to the INS.

## II

### A. Sarantos

█ Before the case went to the jury the trial court instructed the jurors on the elements of the crimes charged against Sarantos. The jury was told, among other things, that before they could find Sarantos guilty of aiding and abetting the making of false statements they must conclude that "he knew . . . [the statements] were false and that he wilfully and knowingly participated in furthering the conduct." After defining knowingly and wilfully as meaning that "one knows what he or she is doing, as distinguished from an inadvertent or careless act," the court further charged the jury that:

. . . if you find that Mr. Sarantos acted with reckless disregard of whether the statements made were true or with a conscious effort to avoid learning the truth, this requirement is satisfied, even though you may find that he was not specifically aware of the facts which would establish the falsity of the statements.

The attorney for Sarantos objected to the charge on the ground that reckless disregard of the falsity of the statements or a conscious effort to avoid learning the truth did not amount to "knowledge." The trial court overruled the objection, and Sarantos now claims the court committed reversible error.

The charge on the issue of knowledge given by the district judge in this case was taken almost verbatim from a charge which we upheld recently in United States v. Egenberg, 441 F.2d 441, 444 (2d Cir. 1971), cert. denied, 404 U.S. 994, 92 S.Ct. 530, 30 L.Ed.2d 546 (U.S. Dec. 14, 1971), a case also involving 18 U.S.C. § 1001. The court in *Egenberg* in turn relied on another decision of this court in United States v. Abrams, 427 F.2d 86, 91 (2d Cir.), cert. denied 400 U.S. 832, 91 S.Ct. 64, 27 L.Ed.2d 63 (1970). We held in *Abrams* that there was sufficient evidence to convict an attorney of knowingly causing the making of a false statement in an affidavit which he completed over his client's signature and filed with the INS, and we stated:

Although appellant may not have been specifically aware of what his client's plans for departure were, the jury could have found from the evidence that appellant acted with reckless disregard of whether the statements made were true and with a conscious purpose to avoid learning the truth.

Defendant offers a number of arguments why these decisions should not foreclose his objection to the charge. First is a frontal attack on *Abrams*, which defendant urges us to overrule. He contends that when an attorney is charged with aiding and abetting the making of a false statement it cannot be

enough to show reckless disregard of its falsity. Otherwise, defendant claims, we radically alter the attorney-client relationship and make the attorney "an investigative arm of the government."

We stand by our decision in *Abrams*. Its purpose in cases such as this was to prevent an individual like Sarantos from circumventing criminal sanctions merely by deliberately closing his eyes to the obvious risk that he is engaging in unlawful conduct. Our ruling in *Abrams* was intended to foreclose this possible loophole, not to create a new crime as defendant suggests. Compare Morissette v. United States, 342 U. S. 246, 263, 72 S.Ct. 240, 96 L.Ed. 288 (1952). Construing "knowingly" in a criminal statute to include wilful blindness to the existence of a fact is no radical concept in the law. See, *e.g.*, Leary v. United States, 395 U.S. 6, 46 n.93, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969);[4] United States v. Squires, 440 F.2d 859, 863–864 (2d Cir. 1971).[5] Nor can it be said that the *Abrams* decision changes the lawyer's role. We have not held, as appellant contends, that an attorney must investigate "the truth of his client's assertions" or risk going to jail.[6] We have held, and continue to hold, that he cannot counsel others to make statements in the face of obvious indications of which he is aware that those assertions are not true. *Cf.* United States v. Benjamin, 328 F.2d 854, 862–863 (2d

Cir.), cert. denied, 377 U.S. 953, 84 S.Ct. 1631, 12 L.Ed.2d 497 (1964).

Defendant also argues that *Abrams* conflicts with the statement this court made in United States v. Diogo, 320 F. 2d 898, 906 (2d Cir. 1963), that "under 18 U.S.C. § 1001 a person does not answer official questions at his peril." The argument overstates the effect of our holding in *Abrams* and misinterprets our statement in *Diogo*. The latter was directed to the problem of determining whether a particular answer to an official question is true or false. The court was referring to the well established rule that to ascertain truth or falsity one must look to the meaning intended by the party who gave the answer and not to the interpretation, however reasonable, given it by government authorities. Our holding in *Abrams*, and here, does not in any way conflict with that proposition.

Sarantos next argues that even if we uphold *Abrams*, we should overrule, or at least modify, our decision in *Egenberg* because it improperly expanded the ruling in *Abrams*. Sarantos points out that in *Abrams* we stated that "the jury could have found . . . that appellant acted with reckless disregard of whether the statements made were true *and* with a conscious purpose to avoid learning the truth" (emphasis added), whereas in *Egenberg* we upheld a charge which sub-

---

4. In *Leary*, the Court followed § 2.02(7) Article 2 of the American Law Institute Proposed Official Draft of the Model Penal Code (May 4, 1962) ("Model Penal Code"), which provides:

When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person is aware of a high probability of its existence, unless he actually believes that it does not exist.

The comments to § 2.02(7) state clearly that the provision was drafted to reach situations where the actor consciously shuts his eyes to avoid knowing whether or not he is committing unlawful acts. Mod-

el Penal Code § 2.02, Comment (Tent. Draft No. 4, 1955).

5. In defining the word "knowingly" in 18 U.S.C. § 922(a) (6) in accordance with § 2.02(7) of the Model Penal Code (see note 4 *supra*), we stated in *Squires* that:

This formulation [Model Penal Code § 2.02(7)] is merely a more comprehensive version of the lay definition of "knowledge" in that it recognizes that there are many facts which one does not "know with certainty," and it comports with the use of "knowingly" in other criminal statutes. . . .

United States v. Squires, *supra*, 440 F.2d at 863.

6. Appellant's Brief at 45.

stituted the word "or" for "and." Since the court below followed the disjunctive phrasing of *Egenberg*, appellant argues that we should revert to the *Abrams* formulation and reverse his conviction. We see no reason to take such drastic action. The phrases "reckless disregard of whether the statements made were true" and "conscious purpose to avoid learning the truth" mean essentially the same thing. Cf. Model Penal Code § 2.02(2)(c) at 26. Therefore, any differences in meaning that might possibly result from the substitution of "or" for "and" would surely constitute harmless error. While we prefer the use of the connective "and" because we think the repetition better impresses on the jurors' minds the importance of finding a deliberate disregard of the facts, we do not think our preference requires a new trial. Cf. United States v. Braver, 450 F.2d 799 (2d Cir. 1971). We do, however, urge the use of "and" rather than "or" in future charges on this issue.

Defendant's final argument is that the facts of this case did not call for the *Abrams-Egenberg* instruction. The short answer is that this was a classic case for its use.

B. *Makris*

Makris was convicted on two counts (3 and 5) of conspiracy to violate 18 U.S.C. §§ 1001, 1546. On appeal, he objects to numerous parts of the trial court's charge to the jury, and particularly to the court's instructions on count 3. We think the charge was in all respects fair and proper, and find it necessary to discuss only defendant's objections to the instructions on count 3.

The Government's evidence relating to that count established the following facts: In January 1964, Makris met with another co-conspirator, Sylvia Cohen, in New York City to request that she find a Puerto Rican woman who was willing to enter into a sham marriage with one Panagiotis ("Pete") Sassalos. When Sylvia found a prospective bride, Luz Rodriquez, she reported her success to Makris. He then instructed her to so inform another co-conspirator, Tassos Christ. Sylvia did so and the wedding date was set.

Luz Rodriquez and Pete Sassalos were married on January 14, 1964. On that same day, the newlyweds visited the office of defendant Sarantos where Luz signed a visa petition in blank. Sarantos completed the form and filed it with the INS. The document falsely stated that the couple was living together at 104 East 31 Street in New York City. Luz testified at trial that, although she was shown the apartment at that address and told to "bring a few dresses there in order to prove that I did live there," she never lived with Sassalos at that or any other residence.

The final events in this scheme took place several months later. On August 13, 1964, Sassalos appeared at an INS office to provide further information so that the Service could determine whether he was eligible for an immigrant visa. Again he falsely stated that he and his wife, Luz, were living together at the address previously given in the visa petition. Obviously unaware of the falsehood, the INS issued Sassalos a permanent residence visa on August 27, 1964.

Before the case went to the jury, defendant's attorney unsuccessfully requested the trial judge to instruct the jury on questions relating to two defenses, the first of which was the statute of limitations. As to that defense, the parties agree that the Government is barred from prosecuting Makris on count 3 if the conspiracy there alleged terminated prior to July 9, 1964.[7] The only issue in dispute is whether the crime, which clearly originated prior to July 9, 1964, continued past that date,

---

7. The indictment was filed July 9, 1969, and the applicable limitations period, 18 U.S.C. § 3282, is five years.

i. e., whether "the conspiracy, as contemplated in the agreement as finally formulated, was still in existence" on July 9, 1964, and whether "at least one overt act in furtherance of the conspiracy was performed after that date." Grunewald v. United States, 353 U.S. 391, 396, 77 S.Ct. 963, 970, 1 L.Ed.2d 931 (1957). See also Toussie v. United States, 397 U.S. 112, 122, 90 S.Ct. 858, 25 L.Ed.2d 156 (1970). The crucial question, therefore, "is the scope of the conspiratorial agreement, for it is that which determines both the duration of the conspiracy, and whether the act relied on as an overt act may properly be regarded as in furtherance of the conspiracy." Grunewald v. United States, *supra*, 353 U.S. at 397, 77 S.Ct. at 970.

■ On the facts of this case, it is clear that the limitations period had not run on count 3 by the time the indictment was filed. The "scope of the conspiratorial agreement" here included as a principal objective the obtaining of permanent residence for Sassalos. That objective had not been secured by July 9, 1964, which indicates on the surface at least that the conspiracy had not terminated by that date. Any doubts on that question, however, are dispelled by Sassalos' appearance before the INS in August 1964 for the purpose of giving false information to obtain permanent residence. His appearance constituted an overt act committed within the scope of the original agreement and in furtherance of its objectives. Thus, under *Grunewald* we think the trial court correctly concluded that an instruction on the statute of limitations was unwarranted.

In his brief to this court, Makris argues that he cannot be held accountable for the appearance by Sassalos before the INS in August 1964 because he was unaware that "an additional affidavit . . . would have to be submitted"[8] beyond the visa petition which was filed in January. He claims that

the August 1964 false statement "was clearly outside of any understanding he might have had with regard to the application and petition for permanent residence."[9] Whether it is in fact true that Makris did not know that one of his co-conspirators might give false information to the INS on occasions other than the filing of the original visa petition is open to considerable doubt. But, even if Makris did not know, the argument is based on the mistaken premise that the scope of the conspiracy was limited to the filing of the immigration papers in January 1964. The Government's charge was that the alleged conspiratorial goals were considerably more ambitious—at the very least to obtain permanent residence for Sassalos. And the judge squarely put to the jury whether there was such a conspiracy, a question its verdict answered affirmatively. To hold Makris accountable for the act of co-conspirator Sassalos in August 1964, we need only conclude that the jury found that he knew the objectives of the conspiracy and assented to them. That he may not have been familiar with every step that would be taken by his co-conspirators to achieve some or all of those objectives is irrelevant to the question before us. *Cf.* United States v. Cobb, 446 F.2d 1174, 1177 (2d Cir. 1971), cert. denied, 404 U.S. 984, 92 S.Ct. 451, 30 L.Ed.2d 369 (U.S. Dec. 7, 1971); United States v. Agueci, 310 F.2d 817, 826–828 (2d Cir. 1962), cert. denied, Guippone v. United States, 10 L.Ed.2d 11, 372 U.S. 959, 83 S.Ct. 1013 (1963). As long as Makris did not disassociate himself from the conspiratorial scheme, and the record contains no evidence that he did, the trial court could properly regard him as a participant throughout the life of the conspiracy.

■ Makris also argues that the trial judge improperly denied his request that the jury be charged on the defense of two conspiracies with regard to count 3.

8. Appellant's Brief at 16–17.

9. Appellant's Brief at 18.

That count charged Makris and others with conspiring to file false statements in order to obtain permanent residence and citizenship for Sassalos.[10] Makris claims that the jurors should have been instructed that if they found evidence of two conspiracies, one to obtain permanent residence and one to obtain citizenship, they should acquit him. We disagree. The record contained no evidence from which the jury might have inferred that there existed a separate conspiracy to acquire citizenship for Sassalos.[11] See United States v. Calabro, 449 F.2d 885, 893 (2d Cir. 1971); United States v. Gonzalez-Carta, 419 F.2d 548, 551–552 (2d Cir. 1969). While we have said that the existence of multiple conspiracies is generally an issue for the jury, see United States v. Dardi, 330 F.2d 316, 327 (2d Cir.), cert. denied, 379 U.S. 845, 85 S.Ct. 50, 13 L.Ed.2d 50 (1964), we have also pointed out that the trial judge is not required to submit the question to the jury every time such a request is made. See United States v. Calabro, *supra*, 449 F.2d at 893. Under the circumstances of this case, defendant's request was totally unwarranted and, therefore, properly denied.

Defendant's other objections to the trial court's charge as "unduly heavy against the defendants" are without merit.

Judgments affirmed.

---

10. An alien admitted to the country as a spouse of an American citizen could apply for citizenship by naturalization after residing in this country for three years.

11. The trial judge did instruct the jury on the defense of two conspiracies as to count 1, which also alleged a conspiracy to obtain permanent residence and citizenship for another Greek alien. The Government's evidence on that count, however, showed that the marriage and filing of the false visa petition to obtain permanent residence occurred in 1963, and the attempt to obtain citizenship in 1966. Thus, it was reasonable to say that from this evidence the jury could conclude that two separate conspiracies were involved, with the result that the statute of limitations barred prosecution of those who participated only in the first conspiracy to obtain permanent residence. The evidence on count 3, however, was not susceptible to such a finding. If the August 1964 appearance by Sassalos before the INS had been for the purpose of acquiring citizenship, then a different case, similar to count 1, would be presented. But, it is undisputed that Sassalos appeared solely for the purpose of obtaining an immigrant visa.